# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| WILLIAM KARMAN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 09-0698-CV-W-NKL-SSA ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## ORDER

Plaintiff William J. Karman ("Plaintiff") challenges the Social Security Commissioner's ("Commissioner") denial of his claim of disability and disability insurance benefits. This lawsuit involves an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 - 433 ("Act"), and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 - 1383b.

On October 28, 2008, following an administrative hearing, an Administrative Law Judge ("ALJ") found that Plaintiff was not disabled. The decision of the ALJ stands as the final decision of the Commissioner. Plaintiff seeks judicial review, petitioning for reversal of the ALJ's decision and an award of benefits. Because the Court finds that the ALJ's decision is not supported by substantial evidence in the record as a whole, the Court grants Plaintiff's Petition in part.

**I. Factual Background**

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] Plaintiff was born in 1970. Plaintiff alleges disability with an amended onset date of March 18, 2005.

Plaintiff suffered a brain aneurysm in March 2002 and was hospitalized for ten days. He had several coils placed in his head as a result.

In April 2002, he saw Dr. John Clough, M.D., of the Kansas City Neurosurgery Group for follow up. Dr. Clough noted headache with frontal behavior.[2]

Plaintiff was treated at Truman Medical Center - West in 2003 and 2004. A June 2003 Neurology consultation indicated that Plaintiff had daily headaches. A July 2003 Neurology follow-up visit indicates that Plaintiff experienced dizziness, lack of coordination ("ataxia"), and daily headaches. A September 2003 visit indicates that Plaintiff had dizziness, lack of coordination, and increasingly-frequent headaches with mood swings. Plaintiff was seen in October 2003 for back pain and lightheadedness. A February 2004 Neurology follow-up lists Plaintiff as having post traumatic headaches and lack of coordination. A March 2004 clinic note lists back pain and lack of coordination. An April 2004 clinic note states that Plaintiff was experiencing knee pain, nosebleeds, post traumatic headaches, and dizziness.

---

[1] Portions of the parties' briefs are adopted without quotation designated.

[2] While the parties have not provided a definition of the term "frontal behavior," and research has not revealed an authoritative definition, Plaintiff's medical records and recurrent research references indicate that the term refers to irregularities in behaviors regulated by the frontal cortex of the human brain, such as memory, judgment, personality, emotion, mood, and morality.

In June 2004, Dr. Clough signed documents stating his medical opinion that Plaintiff's impairments would meet Social Security Listing 11.04A, Sensory or motor aphasia resulting in ineffective speech or communication, and Listing 12.02, Organic mental disorders: psychological or behavioral abnormalities associated with a dysfunction of the brain. Dr. Clough did not indicate that Plaintiff would meet Listing 11.04B. The documents enumerate the requirements for the listed impairments.

In August of 2004, Plaintiff was seen for a Truman Medical Center - West Neurology follow up with intractable headaches and dizziness in episodes lasting twenty to forty minutes. A clinic note from a few days later indicates that Plaintiff's symptoms were unchanged and he was still having falling episodes; he was using a cane but mostly avoiding getting on his feet. An October 2004 Ear Nose and Throat note indicates that his symptoms were unchanged, with dizziness as a result of his aneurysm. A clinic note from April 2005 indicates that Plaintiff had knee pain.

In May 2005, Plaintiff again saw Dr. Clough. Notes indicate that Plaintiff had difficulty during his 2002 hospitalization with anger management and state that Plaintiff suffered some degree of psychological compromise from the aneurysm. Dr. Clough noted some memory deficits. Dr. Clough's notes indicate that difficulty with personality and work issues were common after an aneurysm such as Plaintiff's. Dr. Clough stated this would be permanent and disabling for Plaintiff.

A June 2005 note after testing indicates that Plaintiff remained unchanged neurologically. The note indicates that Plaintiff had personality and work problems since the

aneurysm, and was encouraged to get as much psychiatric help as possible with those issues. A Truman Medical Center - West clinic note from July 2005 reports knee tenderness, gastritis, headache and lack of coordination.

In July 2005, Plaintiff underwent consultative psychological testing by Ronald Holzschuh, Ph. D., as part of his disability determinations process. Dr. Holzschuh's report indicates that Plaintiff was taking medications for pain, headaches, asthma, high blood pressure, and acid reflux, which included a headache medication more often used as an antidepressant. Plaintiff was cooperative in testing and Dr. Holzschuh noted that Plaintiff put good effort into his responses. Plaintiff's affect was appropriate. Plaintiff was oriented, though he described losing his sense of time. He described feeling sad a lot and getting angry. He stated that the only enjoyment he felt was when he was with his girlfriend's three and five year old children.

Dr. Holzschuh did various psychological testing, including objective testing. Dr. Holzschuh concluded that Plaintiff manifests difficulties with attention, concentration, and dealing with novel stimuli. Dr. Holzschuh stated that Plaintiff was able to understand and remember simple instructions, having difficulty with more complex and detailed instructions. Plaintiff appeared to experience fluctuations in attention, concentration, and persistence which seemed related to side effects of the aneurysm and a combination of depression and anxiety. Dr. Holzschuh noted that Plaintiff had balance problems, evidenced by his gait, and anxiety reaction to novel stimuli suggested moderate difficulties coping with changes in his

environment. Dr. Holzschuh noted that Plaintiff could benefit from cognitive, physical, and supportive therapies in dealing with the side effects of his brain injury.

An August 2005 Orthopaedic clinic note shows Plaintiff's knee condition as being diagnosed as Osgood-Schlatter disease; Plaintiff was instructed to use a cane to take the weight off the knee. He was seen again for knee pain in September 2005 and November 2005, and told there was nothing that could be done from an orthopaedic standpoint other than rest.

A December 2005 Truman Medical Center- West clinic note states that Plaintiff was still having knee pain, as well as hernia pain, muscle spasms, and asthma. March 2006 and July 2006 notes are essentially the same. An MRI of Plaintiff's knee confirmed likely Osgood-Schlatter disease.

In January 2006, Dr. David Wooldridge, M.D., of Truman Medical Center signed a form stating that Plaintiff's impairments meet the requirements of Listing 11.04B, Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station.

In November 2006, Plaintiff reported to the Truman Medical Center - West clinic that he fell down stairs and hit his head; the impression was of chronic knee pain, lower back pain associated with knee problems, and hernia pain. January 2007 Orthopaedic clinic notes repeat that radiologic studies indicate Osgood-Schlatter disease and state that Plaintiff was not a good candidate for surgical intervention. March 2007 clinic notes show acute knee

pain, back pain associated with the knee pain, gastrointestinal problems, asthma and depression.

In May 2007, Dr. Wooldridge also completed a Physician's Statement for Disabled Person's License Plates, checking the box indicating permanent disability. A November 2008 letter from Dr. Wooldridge indicates that Plaintiff suffered from a number of medical problems, including a ruptured aneurysm with residual loss of coordination, left knee pain from Osgood-Schlatter disease, asthma, depression, and reflux esophagitis. The knee pain forced Plaintiff to walk with a cane. Dr. Wooldridge concluded that Plaintiff is disabled and unable to work.

In January 2008, John Sand, M.D., performed a consultative neurologic examination. Plaintiff reported some benefit from his headache medication. Dr. Sand noted that Plaintiff had no neurologic defects other than mild gait issues. Dr. Sand noted that aneurysms such as Plaintiff's are frequently associated with behavioral and concentration difficulties, but that those difficulties would be better detected through neuropsychological testing. Dr. Sand opined that Plaintiff could perform less than the full range of sedentary work, but could sit eight hours, stand forty minutes total, and walk ten minutes total in an eight-hour work day.

In June 2008, Dr. Wooldridge again signed a letter, as he did in November 2007, stating that Plaintiff was unable to work due to aneurysm and knee problems.

At the hearing, Plaintiff's attorney requested additional neuropsychological testing as well as IQ testing of Plaintiff.

    A.    **Plaintiff's Testimony**

Plaintiff testified as follows on December 13, 2007. He was thirty-seven years old and attended school through the sixth grade, and had not obtained a GED or attended vocational training.

He had worked at Pizza Hut for approximately eight years, during which time he suffered the aneurysm. After the aneurysm, he tried to continue his work there as a shift manager, but was unable to do the job due to confusion. He had also worked in a convenience store, as a floor refinisher for almost eight years, and at service stations.

He testified to his physical limitations. He had difficulty standing for more than ten minutes, climbing stairs, and bending due to dizziness. He explained that he could not lift his right hand over his head, and that he had several screws in his right shoulder due to a fall; he is right handed. He gets migraines several times per week, triggered by loud noises, and goes in a dark room to sleep when he gets them. He said he could stand for about ten minutes without difficulty from knee, back, and headache pain. He discussed difficulty with coordination.

Plaintiff said he had taken physical therapy, but that it had not really worked, as he still needed the cane and had balance issues. He said that his medications cause fatigue.

Plaintiff explained his mental limitations. He gets confused very easily and has memory difficulty. He is easily agitated, which brings on headaches.

As to his daily living, Plaintiff said he does not shop because he gets confused and lost in the store, and does not cook much because he forgets items that are cooking. Stress and dizziness prevent him from helping around the house.

8

Plaintiff said his lack of balance, headaches, and confusion made it difficult to work.

B.      **Medical Expert Opinion & Testimony**

In March 2008, Dr. Joseph Cools, Ph.D., acted as a medical expert, reviewing Plaintiff's records as part of Plaintiff's disability determinations process. He completed a checkbox form indicating that Plaintiff is moderately limited in the areas of ability to understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention and concentration, make simple work-related decisions, respond appropriately to changes in the work setting, and travel in unfamiliar places and take appropriate precautions. Dr. Cools' checkbox form indicates that Plaintiff is markedly limited in the areas of ability to understand and remember detailed instructions, and carry out detailed instructions. Dr. Cools opined that Plaintiff could be able to learn one to two step tasks "with adequate pace and endurance." Dr. Cools stated that Plaintiff would behave in a socially appropriate manner unless stressed. Dr. Cools noted that Plaintiff's limitations are exacerbated when presented with multiple stimuli and high demand situations, but opined that he would be able to persist in low stress environments. Dr. Cools completed another checkbox form indicating that Plaintiff had an Organic Mental Disorder with change in personality, which included mild restriction in activities of daily living, moderate restriction in maintaining social functioning and concentration/persistence/pace, and one or two episodes of decompensation; Dr. Cools opined that Plaintiff did not establish certain criteria necessary to meet or equal a Listed impairment.

Dr. Cools testified at Plaintiff's hearing. He confirmed his prior opinion that Plaintiff had difficulty with stressful situations, and acknowledged anxiety and depression. Dr. Cools testified that stress is a subjective experience, "but to this individual most of the time he can't relieve his stress. Strict productions standards, which I think they would be very stressful for him, a lot of noise, a lot of activity, and a lot of people shouting at him and shouting orders at him, or customers . . . rattle him tremendously. . . . It would take a pretty specialized job, I think, in order for him to function." Dr. Cools stated that these difficulties are a direct result of the aneurysm.

### C. Vocational Expert Testimony

A vocational expert testified before the ALJ. She opined that Plaintiff could not perform past relevant work. She testified that a person like Plaintiff who had the residual functional capacity ("RFC") assessed by the ALJ would be able to perform the jobs of folding machine operator, photocopy machine operator, bench assembler, document preparer, optical goods assembler, and hand packager.

### D. The ALJ's Opinion

In his written decision, the ALJ noted that Plaintiff has filed two prior claims for disability benefits, one in 1996 and one in 2003, both of which were denied. The ALJ also set forth the requisite five-step process for making disability determinations. See 20 C.F.R. §§ 404.1520, 416.920; *Fastner v. Barnhart*, 324 F.3d 981, 983-84 (8th Cir. 2003).

Applying that process, he found the following severe impairments: status post subarachnoid hemorrhage of an anterior communicating artery aneurysm rupture with a residual organic mental disorder and an Osgood-Schlatter deformity of the left knee.

The ALJ found the Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the Listed impairments. The ALJ relied on Dr. Cools' conclusion that Plaintiff's impairments did not meet Listing requirements. The ALJ explained summarily that, though "a physician" had found that Plaintiff met the requirements of Listings 11.04 and 12.02, the physician did not elaborate.

The ALJ found that Plaintiff has the following RFC: he can perform light work with simple instructions in a low-stress environment (defined as fairly routine work stress in a simple, repetitive job), with no limitation on sitting, the ability to stand/walk for one hour in an eight-hour work day, limited ability to stoop/kneel/crouch/climb, and the need to avoid prolonged walking, unprotected heights, dangerous machinery, vibration, slippery or uneven surfaces.

In reaching this finding, the ALJ considered Plaintiff's medical history. The ALJ noted Plaintiff's 2002 aneurysm.

The ALJ commented that, in 2002, Dr. Clough had opined that Plaintiff could return to work in 2002. The ALJ noted that Plaintiff did not follow-up with Dr. Clough as directed until May 2005, at which point Dr. Clough noted that Plaintiff's memory problems would likely be permanent and disabling. The ALJ noted that Dr. Clough is a neurosurgeon rather than a psychologist or psychiatrist and that, because of Plaintiff's lack of follow-up, the ALJ

noted that Dr. Clough did not have a long-term relationship with Plaintiff. The ALJ also noted that Dr. Clough's assessment of disability occurred during the time Plaintiff was appealing a prior denial of disability benefits when Plaintiff's attorney was given time to submit additional evidence.

The ALJ discussed Plaintiff's knee issues and the relevant medical history. The ALJ acknowledged Dr. Wooldridge's handicapped placard application on Plaintiff's behalf, indicating that Plaintiff needs to use a cane. The ALJ also noted Dr. Sand's consultative neurologic opinion, finding it to be "somewhat inconsistent" and according it partial weight.

The ALJ noted Dr. Wooldridge's letters stating that Plaintiff was unable to work due to the aneurysm and knee problems. The ALJ also noted Dr. Wooldridge's 2006 opinion that Plaintiff met Listing 11.04B, and Dr. Clough's 2004 opinion that Plaintiff met Listings 11.04A and 12.02, but not 11.04B; the ALJ commented that Dr. Clough had not elaborated in his opinion on the Listings. While noting that he was not ignoring the opinions, the ALJ stated generally that Dr. Clough's and Dr. Wooldridge's assessments are not well-supported by acceptable clinical and laboratory diagnostic techniques and inconsistent with other evidence.

The ALJ noted Dr. Holzschuh's consultative psychological evaluation, finding that Plaintiff was able to understand and remember simple instructions, with fluctuations in attention, concentration and persistence, as well as depression and anxiety and difficulty in coping with changes in environment.

12

The ALJ discussed the written medical expert opinion of psychologist Dr. Cools. The ALJ found Dr. Cools' opinion to be consistent with the objective evidence, and "adopt[ed]" that opinion. The ALJ commented that Dr. Cools' opinion was consistent with that of Dr. Holzschuh and reflected a "careful and thoughtful assessment of [Plaintiff's] mental impairments."

The ALJ noted Dr. Sand's finding that Plaintiff was neurologically intact, such that further neuropsychological testing was unnecessary. The ALJ also commented that Plaintiff's school records showed IQ testing assessing an IQ of 94 at "age 16" in 1976,[3] such that further testing was unnecessary. Thus, the ALJ denied Plaintiff's request for further testing.

As to Plaintiff's credibility, the ALJ found him not entirely credible. The ALJ commented that Plaintiff cares for his young daughter despite memory, concentration, and anxiety issues. Though he noted that Plaintiff had substantial earnings prior to the onset date, the ALJ noted that Plaintiff had not sought job retraining after the aneurysm. The ALJ noted Plaintiff's history of noncompliance with treatment, and minimal recent objective treatment for either aneurysm or knee issues. The ALJ commented that Plaintiff had not sought consistent treatment from a mental health provider. The ALJ pointed out that Plaintiff's current onset date was three years after his aneurysm, and that most of his treatment occurred

---

[3] Born in 1970, Plaintiff was actually age 6 in 1976.

13

prior to the onset date. The ALJ repeatedly stated that a prior ALJ and appeals counsel had denied Plaintiff's claim that he was disabled by the aneurysm.

Relying on the vocational expert's testimony, the ALJ found Plaintiff able to perform jobs that exist in significant numbers in the national economy. Thus, the ALJ found Plaintiff "not disabled."

## II. Discussion

The Court must determine whether there was substantial evidence in the record to support the ALJ's finding that Plaintiff does not have a disability entitling him to benefits. *Dixon v. Barnhart*, 324 F.3d 997, 1000 (8th Cir. 2003). "Disability" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). "Substantial evidence to support an ALJ's finding on disability is relevant evidence that reasonable minds might accept as adequate to support the decision." *Id.* (citations omitted). In reviewing the ALJ's decision, the Court may not decide facts anew, reweigh the evidence or substitute its judgment for that of the ALJ. *See Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993). The Court must defer heavily to the supported findings and conclusions of the ALJ. *See Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

Plaintiff appears to argue that the ALJ improperly dismissed the opinions of his treating physicians in determining whether Plaintiff's impairments meet or equal a presumptive-disability Listed impairment and in determining Plaintiff's RFC. Plaintiff also

argues that the ALJ improperly relied on the vocational expert's testimony because that testimony assumed the ALJ's faulty RFC finding.

In evaluating medical evidence, treating physicians' opinions generally are entitled to controlling weight. 20 C.F.R. § 416.927(d)(2). However, an ALJ may disregard the opinions of treating physicians to rely on the medical opinions of consulting physicians (1) where the consulting physicians' assessments are supported by better or more thorough medical evidence, or (2) where a treating physician issues inconsistent opinions that undermine the credibility of those opinions. *See Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000) (internal quotations omitted). ALJs may not substitute their own opinions for those of medical professionals, *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir.2005); and some medical evidence must support ALJs' RFC findings, *Dykes v. Apfel*, 223 F.3d 865, 866-67 (8th Cir. 2000). Still, ALJs are not bound by physicians' ultimate opinions as to whether applicants meet a Listing or are unable to work, as those are issues reserved to the Commissioner. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008). Even where claimants are represented by counsel, ALJs have the duty of fully and fairly developing the record. *See Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir.2002) (finding that ALJ erred in relying on the opinion of a non-examining consultant and failing to develop the record as to RFC where a treating physician's notes were "cursory").

Here, the ALJ dismissed the opinion of Plaintiff's treating physician in favor of Dr. Cools, who had never examined Plaintiff. The ALJ rejected Dr. Wooldridge's opinion with

regard to whether Plaintiff's impairments met or equaled a Listed impairment. Dr. Wooldridge opined in 2006 that Plaintiff's lack of coordination met the criteria for presumptive disability Listing 11.04B. Listing 11.04, addresses "Central nervous system vascular accident" with "A. Sensory or motor aphasia resulting in ineffective speech or communication; or B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." Listing 11.00C describes "Persistent disorganization of motor function in the form of ... ataxia."

Dr. Wooldridge's opinion regarding the Listing is consistent with his other opinions as well as the record evidence. After opining that Plaintiff met a Listing, Dr. Wooldridge twice wrote a letter indicating that the combination of Plaintiff's medical conditions rendered him unable to work, consistent with his opinion on the Listing. All relevant records indicate that Plaintiff requires a cane to walk. Plaintiff's medical records repeatedly refer to ataxia, *i.e.*, difficulty with coordination. Even Dr. Sand – a consulting examining neurologist – indicated that Plaintiff could stand for only forty minutes and walk for only ten minutes. Two treating physicians had opined that Plaintiff met Listing requirements: though not completely congruent with Dr. Wooldridge's opinion on Listing, Dr. Clough had previously opined that Plaintiff met the requirements of 11.04A and 12.02, Organic Mental Disorders: Psychological or behavioral abnormalities associated with a dysfunction of the brain.

However, the ALJ gave no specific reason for finding that Plaintiff did not meet a Listing. Instead, the ALJ summarily dismissed Dr. Wooldridge's Listing opinion as

16

inconsistent with Dr. Clough's earlier suggestion that Plaintiff did not meet listing 11.04B. Unlike Dr. Wooldridge's opinion, Dr. Clough's was issued before Plaintiff's onset date; and the ALJ had also emphasized that Dr. Clough did not have a long-term relationship with Plaintiff. Dr. Wooldridge's opinion cannot be said to be invalidated by another opinion, outside the onset date, that the ALJ found to be inadequate.

The ALJ's failure to address why he found that Plaintiff did not meet the Listing 11.04B requirements leaves the Court without a basis upon which to evaluate whether that decision was based on substantial evidence. *See Smith v. Barnhart*, 54 Fed. Appx. 83, 86 (3d Cir. 2002). Listing 11.04B addresses disorganization of motor function, which is difficult to assess without physical examination. *See Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986) (remanding a finding that a claimant did not meet Listing 11.04 based on a nonexamining expert's opinion). There is little medical evidence in the record speaking directly to the terms used in Listing 11.04B. Though the ALJ summarily relied on Dr. Cools with regard to the impact of Plaintiff's physical impairments, the ALJ did not cite to any evidence presented by Dr. Cools or otherwise that indicates that Plaintiff does not meet the physical disability Listing 11.04B.

Plaintiff requested additional neuropsychological testing and IQ testing – apparently seeking to establish that Plaintiff met the requirements of Listing 11.04A and 12.02 as opined earlier by Dr. Clough. The ALJ also found there was an insufficient basis to grant Plaintiff's request for additional neuropsychological and IQ testing. The ALJ based this decision on Dr. Sand finding Plaintiff neurologically intact; however, Dr. Sand expressly recommended

17

neuropsychological testing with regard to Plaintiff's behavioral and concentration difficulties. The ALJ denied additional IQ testing on the apparently mistaken belief that past testing was done at age sixteen, when the record reflects testing at age six; even if IQ results from either age would have been acceptable for present purposes, the repeatedly noted neurological impact of Plaintiff's aneurysm brain injury indicates that he should now be retested.

The relevance of such testing is seen in a review of Listing 12.02. Under Listing 12.02, first, the following must be satisfied: "History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." Next, the required level for severity of Listing 12.02 is met when the requirements in both subsection A plus the requirements of subsections B or C are met. Subsection A may be satisfied by showing a loss of measured intellectual ability of at least 15 IQ points; thus, any impact of the aneurysm on Plaintiff's IQ is relevant. Subsection B may be satisfied by showing, among other things, marked difficulties in maintaining concentration, persistence or pace. Subsection C may be satisfied by showing a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. Plaintiff's physicians, including consulting examining physicians and Dr. Cools himself, indicated that Plaintiff would have to work in a very-specialized low stress environment. The record does

not include enough evidence from which to determine whether this need amounts to satisfaction of subsections B or C of Listing 12.02.

The ALJ had a duty to more fully develop the record to fill in gaps in evidence concerning whether Plaintiff's impairments meet a Listing. The ALJ's summary dismissal of the opinion of Plaintiff's treating physician in favor of Dr. Cools was improper in light of its consistency with the record. There is not enough evidence in the record from which to determine whether Plaintiff's impairments meet a Listing, such that the ALJ's finding regarding the Listings is not supported by substantial evidence.

After finding that Plaintiff's impairments do not amount to a presumption of disability under a Listing, the ALJ again dismissed the medical evidence concerning the impact of Plaintiff's impairments on his ability to walk and stand in assessing RFC. Despite consulting physician Sand's opinion that Plaintiff could walk up to forty minutes and stand for ten minutes, the ALJ found that Plaintiff could stand or walk for up to an hour in an eight-hour workday. However, neither the ALJ nor the Commissioner's briefing points to medical evidence supporting the finding that Plaintiff can stand or walk that long. The ALJ's RFC finding concerning Plaintiff's ability to stand and walk is also not supported by substantial evidence. Because the vocational expert's testimony was based on that unsupported RFC finding, it was not a proper basis upon which to conclude that Plaintiff is not disabled.

## III. Conclusion

Accordingly, it is hereby ORDERED that Plaintiff's Petition [Doc. #5] is GRANTED IN PART. This matter is remanded for further proceedings consistent with this Order.

s/ NANETTE K. LAUGHREY  
NANETTE K. LAUGHREY  
United States District Judge

Dated: May 24, 2010  
Jefferson City, Missouri